FILED
2013 Jun-14  PM 02:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| RICHARD M. POWELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 2:13-cv-0055-LSC |
| | ) | |
| CHARLES GORHAM, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OF OPINION

## I.    Introduction

The Court has before it the Joint Motion to Dismiss on Common Grounds (Doc. 34) filed by all of the defendants in this action.  Individual motions to dismiss have also been filed by each defendant: J. Mark White and White Arnold & Dowd P.C. (Docs. 35, 46); L. Stephen Wright and Najjar Denaburg P.C. (Docs. 37, 47); John Carroll (Docs. 38, 45); Judith S. Crittenden and The Crittenden Firm P.C. (Docs. 40, 44); and Wendy B. Crew and Crew & Howell P.C. (Docs. 41, 48).[1] Plaintiffs have

---

[1] Plaintiffs responded to the motions to dismiss by amending their complaint.  (Doc. 42).  This prompted another round of dismissal motions, each stating that the amended complaint did not change or alter the arguments raised in the original motions to dismiss.  All further references to the "complaint" in this opinion will refer to the amended complaint.

responded to all of the motions, and each defendant has replied.  For the reasons that follow, the joint motion to dismiss is due to be granted, and the individual motions to dismiss are due to be denied as moot.

## II.   Appropriate Standard of Review

### A.   Conversion of Motions to Dismiss into Motions for Summary Judgment

In their joint motion, the defendants assert that multiple grounds support dismissal of all claims against the defendants in this lawsuit, among them that: 1) all of the plaintiffs' claims are barred by the doctrines of res judicata and some are barred by the doctrine of collateral estoppel; 2) the applicable statutes of limitations bar the plaintiffs' § 1983 claims, fraud and suppression claims, and the RICO[2] claims asserted by plaintiff Belinda Stephens; 3) the plaintiffs' RICO claims fail to state a claim upon which relief may can be granted; and 4) the plaintiffs' class action allegations are due to be dismissed.  In support of these arguments, the defendants referred to and attached evidentiary submissions primarily consisting of pleadings, orders, and other filings submitted in two prior federal lawsuits involving the same plaintiffs, or their counsel, or the same defendants as in this case.  Defendants argued that the Court could consider these matters outside the complaint on a motion to dismiss for several

---

[2]  The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

reasons.  First, they referred to their res judicata and collateral estoppel arguments as "lack of subject matter jurisdiction" defenses raised pursuant to Federal Rule of Civil Procedure 12(b)(1). According to Defendants, then, the Court was free to "independently weigh facts" and consider extrinsic evidence on the motion to dismiss. (*See* Joint Motion, Doc. 34 at p. 4 n.2, citing *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003)).  Second, the defendants stated that to the extent they raised other Rule 12(b)(6) defenses, the documents they referred to had been mentioned in Plaintiffs' complaint and brief in support of the complaint.  (*See id.,* citing *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004)).  Finally, the defendants argued that the Court could take judicial notice of pleadings filed in related actions pursuant to Fed. R. Evid. 201(b)(2).  Notably, Plaintiffs never disputed the existence of any of the documents referred to and attached to the motion to dismiss, nor did they argue that an improper standard for reviewing a motion to dismiss was being proffered by the defendants.  In fact, in their response briefs, Plaintiffs presented their arguments as if they assumed that the Court would consider the filings from the prior lawsuits.

Nonetheless, Defendants' reliance on *Morrison* was misguided because, while that case sets out the standard for a court's consideration of a Rule 12(b)(1) defense,

nowhere does it provide that res judicata and collateral estoppel are "lack of subject matter jurisdiction" defenses.  To the contrary, the Eleventh Circuit has recently stated in a published decision:

> A party may raise the defense of res judicata in a Rule 12(b)(6) motion when the existence of the defense can be judged from the face of the complaint. [*Jones v. Gann*, 703 F.2d 513, 515 (11th Cir. 1983)] Although analysis of a Rule 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto, a court may consider documents attached to the motion to dismiss if they are referred to in the complaint and are central to the plaintiff's claim. *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1368–69 (11th Cir. 1997) (citation omitted). When the court considers matters outside the pleadings, however, the Rule 12(b)(6) motion converts into a Rule 56 motion for summary judgment. *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1266 n. 11 (11th Cir. 1997). The court must notify the parties and give them ten days to submit "any relevant evidence and arguments in support or opposition to the merits." *Id.* (citation omitted). We have excused the ten-day requirement, however, when the "parties are aware of the court's intent to consider matters outside the record and have presented all the materials and arguments they would have if proper notice had been given." *Id.* (citation omitted).

*Starship Enters. of Atlanta, Inc. v. Coweta County, Ga.*, 708 F.3d 1243, 1253 n.13 (11th Cir. 2013).  This Court finds that all of the defenses raised by the defendants are Rule 12(b)(6) defenses, not Rule 12(b)(1) defenses.  And, as in *Morrison*, it became clear to the Court from the parties' submissions that a complete evaluation of the defendants' motions would require the Court to consider matters outside the pleadings in this case.  It was not enough that Plaintiffs merely "referenced" prior lawsuits in their

complaint and brief in support of their complaint, because it cannot be said that these prior lawsuits are "central to the plaintiff's claim." *See Starship Enters.*, 708 F.3d at 1253 n.13. Thus, in an abundance of caution,[3] the Court entered an Order (doc. 64) declaring that it would treat the motions to dismiss as motions for summary judgment under Federal Rule of Civil Procedure 56. *See* Fed. R. Civ. P. 12(d).[4] In the Order, the Court stated that it believed that it had already been presented with all of the

---

[3] The defendants in *Starship* filed a motion to dismiss arguing that claims should be dismissed on res judicata grounds, and attached a prior state court pleading and order. 708 F.3d at 1253 n.3. The plaintiff argued on appeal that the district court erred in invoking res judicata in dismissing some of its claims because the complaint contained insufficient facts on which to adjudicate the defense. *Id.* The Eleventh Circuit held that, because the plaintiff never referred to any prior pleadings in its complaint, it would treat the district court's opinion as if it automatically converted the motion to dismiss into a motion for summary judgment. *Id.* The court further held that, although there was nothing in the record indicating that the district court gave the parties ten days' notice of its intent to consider matters outside the pleadings on the motion to dismiss, the plaintiff's opposition brief to the motion to dismiss showed that it had notice that the district court would consider matters outside the pleadings. *Id.* As such, the Eleventh Circuit held that the district court did not err in considering matters outside of the pleadings. *Id.*

[4] The Court could possibly have avoided converting the motions into summary judgment motions pursuant to Fed. R. Evid. 201, which provides that a court may take judicial notice of, *inter alia*, a fact that is generally known within the trial court's territorial jurisdiction, and that the court can take judicial notice on its own or must take judicial notice if a party requests it and supplies the necessary information. The Eleventh Circuit has said, in an unpublished case, that public records are among the permissible facts that a district court may take judicial notice of and thus consider on a motion to dismiss without converting the motion to one for summary judgment. *Univ. Exp., Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) (holding that the district court was not obliged to convert a motion to dismiss into a motion for summary judgment even though it considered a complaint filed by the S.E.C. in the Southern District of New York) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (holding that a court when considering a motion to dismiss in a securities fraud case may take judicial notice, for the purpose of determining what statements the documents contain and not to prove the truth of the document' contents, of relevant public documents required to be filed with the SEC)). Nonetheless, the motions were converted into summary judgment motions in accordance with *Starship Enterprises*.

extrinsic evidence necessary to issue a ruling on these motions based upon the doctrine of res judicata and/or statute of limitations principles, but nonetheless gave the parties eleven (11) days in which to file any additional evidence that the party wished the Court to consider when ruling on the defendants' motions for summary judgment. *See* Fed. R. Civ. P. 12(d) (stating that when the Court treats a motion to dismiss as a motion for summary judgment, all parties must be given a reasonable opportunity to present material that is pertinent to the motion). Specifically, the Court instructed the parties to submit any additional evidence pertinent to the res judicata and statute of limitations arguments raised in the already-filed briefs. None of the parties submitted any additional evidence in response to the Court's order. The motions for summary judgment are thus ripe for review.

### B.    Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also* Fed. R. Civ. P. 56(c). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp.*, 281 F.3d at 1224 (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## III.   Background Facts[5] and Procedural History

### A.   Previously Filed Lawsuits

---

[5] Because the Court converted the motions to dismiss into motions for summary judgment, all reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

This is not the first time that Plaintiffs' counsel, Alabama lawyer and professor at Samford University's Cumberland School of Law Joseph W. Blackburn ("Blackburn"), has raised allegations regarding a hunting club conspiracy among lawyers and judges in the domestic relations bar in Jefferson County, Alabama. Blackburn first raised the issue over ten years ago in his own divorce case in the Circuit Court of Jefferson County, Alabama, Civil Action No. DR-2001-2948. Blackburn was represented in his divorce by George R. Fernambucq ("Fernambucq").  Blackburn's now ex-wife was represented by L. Stephen Wright of Najjar Denaburg, P.C. ("Wright and Najjar"), who is also a named defendant in this lawsuit. The Honorable John C. Calhoun ("Judge Calhoun") presided over the divorce action.

The Blackburns' divorce decree was entered by Judge Calhoun on January 6, 2003. Blackburn requested Fernambucq to raise the issue of an alleged hunting club conspiracy, in which certain judges and lawyers were given preferential treatment in divorce cases, at a hearing in February 2003, as support for his contention that Judge Calhoun should recuse himself from the case and grant a new trial. (*Blackburn v. Fernambucq*, Circuit Court of Jefferson County, Alabama, CV05-698, Order on Motion for Summary Judgment, pp. 3-4.) Fernambucq ultimately withdrew from

representing Blackburn because he believed Blackburn's assertion of alleged improprieties with the hunting club to be meritless. (*Id*. at 4-5.)

Blackburn later appealed the divorce decree, and the Alabama Court of Civil Appeals affirmed. (*See* Doc. 36-1).  The Alabama Supreme Court thereafter denied Blackburn's petition for writ of certiorari. (*See id.*)

Blackburn filed other pleadings asserting impropriety with regard to a hunting club, including an independent action pursuant to Alabama Rule of Civil Procedure 60(b) filed in October 2003 against his ex-wife alleging that the divorce decree was void and requesting that it be set aside. (*Blackburn v. Blackburn*, Circuit Court of Jefferson County, Alabama, CV03-6309.)  The independent action was later dismissed by Judge Helen Shores Lee.  Blackburn also filed a complaint against Judge Calhoun with the Judicial Inquiry Commission, but no action was taken against Judge Calhoun. (*See Blackburn v. Fernambucq*, Circuit Court of Jefferson County, Alabama, CV05-698.)  In 2005, Blackburn sued Fernambucq and his law firm in a state court legal malpractice action. (*See id.*) Blackburn's legal malpractice lawsuit was dismissed as time barred.

### B.    The First Lawsuit

On January 25, 2007, after failing at his attempts to assert a hunting club

conspiracy in the divorce and legal malpractice actions, Blackburn filed a federal lawsuit as a pro se litigant on behalf of a purported class of all persons involved in domestic relations cases in Jefferson County before Judge Calhoun, alleging RICO and other state law claims, including fraud and suppression.  The case was styled *Blackburn v. Calhoun, et al.*, N.D. Ala., CV-07-P-0166-S ("The First Lawsuit"). Blackburn sued numerous defendants: Fernambucq and his law firm, Boyd, Fernambucq & Vincent, P.C. (the attorneys who represented Blackburn in his divorce); Wright and Najjar (the attorneys who represented Blackburn's ex-wife in the divorce); Judge Calhoun (the circuit judge presiding over the divorce); Charles Gorham and Gorham & Cason LLC (collectively "Gorham"), and several categories of unknown co-conspirator defendants.

All defendants in the First Lawsuit filed Motions to Dismiss or Motions for Summary Judgment. On March 4, 2008, Judge Edenfield[6] dismissed all claims against the defendants pursuant to a 32-page opinion.  *See Blackburn v. Calhoun*, 2008 WL 850191 (N.D. Ala. March 4, 2008). As to Judge Calhoun, the Court found that all of Blackburn's allegations were related to Calhoun's rulings in the Blackburn divorce proceeding; thus, judicial immunity barred those claims. *Id.* at *18. The Court found

------

[6]   On February 13, 2007, the First Lawsuit was reassigned to the Honorable B. Avant Edenfield, District Judge for the Southern District of Georgia.

multiple grounds to dismiss the allegations made by Blackburn against Wright and Najjar. *Id.* at \*20.  First, the Court found the RICO claims were time-barred because they were filed more than four years after Blackburn admitted reading his divorce decree which Blackburn claimed caused him harm. *Id.* at \*19-20.  Second, the Court found that Blackburn's state law claims of fraud and suppression were barred by Alabama's two year statute of limitations. *Id.* at \*20.  Third, the Court found that Blackburn had failed to state a RICO claim.  The RICO pleading defects included his failure to plead sufficiently proximate cause.  *Id.*  Significant was the fact that Blackburn failed to plead how Wright and Najjar defrauded him when "in no way can it be said that he [Wright] and his law firm [Najjar] owed Blackburn any sort of duty."

*Id.*  Judge Edenfield further went on to hold:

> Put another way, it is not enough to allege that these two defendants [Wright and Najjar] were part of a conspiracy to rip-off an entire judicial circuit (by abetting a crooked domestic relations court) and that plaintiff, as a member of that community, suffered harm along with everyone else by being deprived of judges' honest services, and by being deprived of the equal opportunity to run for judicial office in a kickback-free judicial circuit where non-insiders have no equal opportunity to compete for judicial office. *Williams* and the other proximate-cause/standing cases discussed supra show that the harm must be more direct (and thus less cosmic) and substantial than that.  Blackburn has pled no facts showing how these defendants used the mail or wires specifically to defraud him in a substantial enough (damages-wise) way.

*Id.* (emphasis added). The other RICO pleading defect related to Blackburn's failure

to sufficiently allege Article III standing requirements "since these defendants are alleged only to have contributed to the operation of a corrupt tribunal in general, and not specifically to (and thus at the requisite proximate-cause level) harm Blackburn." *Id*. at *21. The Court succinctly disposed of the class action allegations since Blackburn's substantive claims were barred. *Id*. The Court also held that the proposed class lacked Rule 23(c)'s requirement of commonality as each divorce case of each proposed plaintiff would have to be reviewed "to determine if 'mal-adjudication' even occurred in the first place." *Id*.  The Court dismissed the claims against Gorham on the basis that the alleged RICO claims lacked continuity (because Judge Calhoun was no longer a domestic relations judge) and because Blackburn failed to plead sufficiently proximate RICO causation and Article III standing. *Id*. at *22.  As to Fernambucq and his law firm, the Court held that collateral estoppel and res judicata barred Blackburn's claims, holding that the First Lawsuit was a reiteration of the earlier filed (and dismissed) state court legal malpractice action. *Id*. at *23-24.  The Court also found that the Fernambucq defendants were due to be dismissed based upon statute of limitations grounds. *Id*.

All of the attorney defendants named in the First Lawsuit moved that Rule 11 sanctions be imposed against Blackburn. Although Judge Edenfield denied the

defendants' motions for sanctions, he stated that the underlying allegations "seem to be the product of a creatively cynical mind, seem to be blatantly false if not wildly overblown, and thus seem to be 'Rule 11 frivolous.'" 2008 WL 850191, at *29. Judge Edenfield stated that he believed a Rule 11 foundation would have been established by the defendants if discovery had been conducted in the case. *Id.*

Blackburn appealed, and the Eleventh Circuit Court of Appeals affirmed and agreed with the reasons for dismissal found in Judge Edenfield's "thoroughgoing" order. *Blackburn v. Calhoun*, 296 F. App'x 788 (11th Cir. 2008).

### C.    The Second Lawsuit

Blackburn filed a second federal lawsuit on August 12, 2009, as counsel for Belinda Stephens ("Ms. Stephens"), Richard M. Powell ("Mr. Powell"), and Larry Clements ("Mr. Clements"), each of whom claimed they were injured as the result of their divorce decrees.  That case was styled *Richard A. Powell, Larry A. Clements and Belinda M. Stephens v. Charles Gorham, et al.*, 2:09-cv-01616-RRA ("The Second Lawsuit").  The Second Lawsuit named the same defendants as the First Lawsuit and added another state court judge, the Honorable R.A. Ferguson ("Judge Ferguson") as a defendant.[7]  The Second Lawsuit again asserted RICO violations and fraud and

---

[7]  More specifically, the named defendants and their alleged involvement was as follows: Gorham (alleged to have represented Mr. Clements in his divorce and alleged to have represented

suppression under Alabama law.

On September 3, 2009, all of the defendants named in the Second Lawsuit filed either motions to dismiss or for judgment on the pleadings.  On September 7, 2009, Blackburn moved to withdraw as attorney for the plaintiffs, and his motion was granted by the Court the next day.  On September 13, 2009, Blackburn re-appeared for all plaintiffs and filed a Notice of Dismissal requesting that the attorney defendants be dismissed without prejudice pursuant to Federal Rule of Civil Procedure 41. Magistrate Judge Armstrong entered an order dismissing the attorney defendants (including Wright and Najjar) without prejudice.

As counsel for plaintiffs in the Second Lawsuit, Blackburn first raised his alleged "obstruction of justice" claim—the same claim as alleged in this lawsuit, discussed *infra*—on May 14, 2010, by filing a "Request for Hearing on Current and Dismissed Defendants' Obstruction of Administration of Justice, Obstruction of Justice." In that pleading, Blackburn alleged that Alabama lawyers Wendy B. Crew, Judith S. Crittenden, and J. Mark White had complained to John Carroll, Dean of

---

Ms. Toler, who was an alleged class member, in her divorce); Wright and Najjar (lawyer/law firm representing Mr. Stephens, who was the ex-husband of plaintiff Ms. Stephens, in the Stephens divorce); Fernambucq (lawyer/law firm representing Mr. Toler, an alleged class member, in his divorce); Richard Vincent (not alleged to be involved in the Powell, Toler or Stephens' divorces); Judge Calhoun (circuit court judge presiding over Clements', Toler's, and Stephens' divorces); and Judge Ferguson (circuit court judge presiding over modification of Powell divorce).

Cumberland School of Law and Blackburn's immediate supervisor ("Dean Carroll"), with regard to the allegations made by Blackburn in the Second Lawsuit. Blackburn argued that these actions were taken "for the explicit purpose of corruptly causing this action [Second Lawsuit] to be dismissed," and he requested the Court to hold a hearing "and take evidence as to obstruction of administration of justice and witness tampering in the instant case as a result of said defendants' communications and complaints to Professor Blackburn's employer leading to dismissal of named attorney defendants. . . ."

Blackburn attached a communication he received from Dean Carroll dated September 4, 2009, which stated in pertinent part:

> There is nothing in the Samford University Faculty Handbook that would prevent you from representing a client in court, so long as that representation does not detract from the performance of your duties here at the law school.  Accordingly, your representation may not interfere with your teaching, writing and committee work.  Also, as we discussed in relation to your previous lawsuit, you may not use any law school resources in furtherance of your representation.  You may not use law school copying machines or ask secretaries to assist you.

> We also discussed the fact that your continued pursuit of allegations of corruptions [sic] against prominent lawyers and judges in this lawsuit could result in requests for Rule 11 sanctions against you and might result in disciplinary charges.  … While you certainly may represent someone in court without running afoul of University policy, if that representation were to result in sanctions or disciplinary action against you and the findings related to those sanctions amount to cause for revocation of

tenure, the law school would have the right to initiate proceedings to revoke your tenure.  Obviously, neither you nor I would want that to happen.

Blackburn also attached his response to Dean Carroll dated September 7, 2009,

in which he stated:

> I have just received your letter containing explicit threats of the most serious job actions against me due to my representation of clients in the above-referenced litigation.
> …
>
> With this very pointed threat from you as the Dean, I cannot possibly continue to represent my clients.  At some point in this litigation, additional defendants may have to be added, including those very friends and class mates whose interests you have undertaken to defend.

Judges Ferguson and Calhoun opposed the plaintiffs' request for a hearing. On

June 8, 2010, before ruling on the dispositive motions of Judges Calhoun and

Ferguson, Magistrate Judge Armstrong denied Plaintiffs' request for a hearing stating

that there had been no showing of the Court's authority to conduct it.

Magistrate Judge Armstrong[8] thereafter granted the motions to dismiss of

Judges Ferguson and Calhoun holding that both were immune from suit by the

plaintiffs.  The Court found that "all of the damages to the plaintiffs at bar flowed

directly from orders issued by the judges," citing extensively to Judge Edenfield's

---

[8] The plaintiffs, Judge Calhoun and Judge Ferguson (the only parties still in the case) consented to Magistrate Judge Armstrong exercising full jurisdiction in the case.

findings in the First Lawsuit. (Second Lawsuit, Memorandum Opinion, p. 14.) Magistrate Judge Armstrong further found that any other alleged improper action by the judges "such as scheduling of dockets, failing to file required reports to the Ethics Commission, alleged Hobbs Act violations prior to becoming a judge, acts relating to mediation or arbitration and money laundering after leaving office did not directly cause the alleged damages." *Id.*

After the dismissal Order was entered, the plaintiffs in the Second Lawsuit, through Blackburn, their counsel, filed a Rule 59 Motion to Alter or Amend. The motion not only requested reversal of the dismissal order, but also accused Magistrate Judge Armstrong of having improper ex parte communications regarding the lawsuit, characterized the order of dismissal as "hastily drafted and ill-conceived," and concluded that "Defendant's and coconspirators' actions of obstruction and threatening communications coupled with Judge Armstrong's refusal to comply with Rule 2.9 . . . constitute fraud on the judicial process and grounds for a New Trial." Magistrate Judge Armstrong denied the plaintiffs' Rule 59 motion on its merits and denounced Blackburn's suggestion of impropriety, ex parte conferences, disqualification, or fraud on the judicial process. (Second Lawsuit, Order of June 16, 2010, p. 6).

On behalf of the plaintiffs, Blackburn appealed, and the Eleventh Circuit affirmed the dismissal for the reasons set forth in Magistrate Judge Armstrong's Memorandum Opinion. *Powell v. Gorham*, 397 F. App'x 572 (11th Cir. 2010).

### D.    The Present (Third) Lawsuit

Now, almost three and a half years after the attorney defendants were dismissed from the Second Lawsuit, Blackburn has filed the Third Lawsuit, this time only on behalf of Mr. Powell[9] and Ms. Stephens.

The Third Lawsuit originally named as defendants all of the named defendants from the Second Lawsuit minus Judges Calhoun and Ferguson. However, Plaintiffs subsequently dismissed with prejudice defendants Charles Gorham and the law firm of Gorham & Cason LLC, and George R. Fernambucq and Richard Vincent and the law firm of Boyd Fernambucq & Vincent P.C. Wright and Najjar is named as a defendant and has not been dismissed. In addition, Plaintiffs also named as defendants Wendy B. Crew and the law firm Crew & Howell, P.C.; Judith S. Crittenden and The Crittenden Firm, P.C., J. Mark White and the law firm of White, Arnold & Dowd, P.C., and Dean Carroll (hereinafter, "Crew," "Crittenden,"

---

[9] On May 29, 2013, Plaintiffs filed a notice of Mr. Powell's death, stating that it was unknown who will be his executor and whether his estate will continue in this matter as his representative. (Doc. 65.)

"White," and "Dean Carroll"). Plaintiffs allege that Crew, Crittenden, and White were members of the category of fictitiously named defendants referred to as "Unknown Attorneys" in the First and Second Lawsuits. (Complaint, ¶ 7 and n.6.) Plaintiffs also allege that Dean Carroll was one of the previously unnamed hunting club co-conspirators. (Complaint, ¶¶ 8, 32, 38.)

Plaintiffs' 75-page complaint in the Third Lawsuit is in many parts disjointed and difficult to discern. It restates the allegations in the First and Second Lawsuits, interspersed with references to the named plaintiffs, often without any clear explanation or connection between the two, and with over 100 footnotes referencing backwards and forwards to other paragraphs within the complaint. Plaintiffs also filed a "Brief in Support of Complaint," which contains recitations of law they contend are applicable to their claims. *See* Doc. 3. Nonetheless, what is clear from the complaint is that it contains factual allegations identical to the First and Second Lawsuits, as follows:

1) Prior to 1993, the Defendants were members of a Hunting Club that allegedly then was converted to a RICO Enterprise. (First Lawsuit Complaint, ¶ 11; Second Lawsuit Complaint, ¶ 14; Third Lawsuit Complaint, ¶ 38);

2) The Defendants conspired to have appointed John Calhoun as a domestic relations judge. (First Lawsuit Complaint, ¶ 25; Second Lawsuit Complaint, ¶ 15; Third Lawsuit Complaint, ¶ 41);

3)     The first goal of the alleged RICO Enterprise "was to have Defendant Calhoun nominated to fill the 1993 judicial vacancy" and thereafter to be reelected. (First Lawsuit Complaint, ¶ 25; Second Lawsuit Complaint, ¶ 97; Third Lawsuit Complaint, ¶ 198);

4)     The second goal of the alleged RICO Enterprise was to increase the Defendants' market share of the domestic relations law practice in the Tenth Judicial Circuit. (First Lawsuit Complaint, ¶ 26; Second Lawsuit Complaint, ¶ 98; Third Lawsuit Complaint, ¶ 199);

5)     The third goal of the alleged RICO Enterprise was to provide alleged Enterprise profits to Calhoun (and Ferguson per the Second and Third Lawsuits) by way of benefits or kickbacks. (First Lawsuit Complaint, ¶ 27; Second Lawsuit Complaint, ¶ 99; Third Lawsuit Complaint, ¶ 200);

6)     The fourth goal of the alleged RICO Enterprise was to devise a scheme to award excessive and inflated attorneys' fees. (First Lawsuit Complaint, ¶ 28; Second Lawsuit Complaint, ¶ 100; Third Lawsuit Complaint, ¶ 201);

7)     The fifth goal of the alleged RICO Enterprise was to employ a scheme to defraud the public while keeping the hunting club a secret. (First Lawsuit Complaint, ¶ 29; Second Lawsuit Complaint, ¶ 101; Third Lawsuit Complaint, ¶ 202);

8)     A class should be certified of persons involved in domestic relations cases in Jefferson County before Judge Calhoun (and Judge Ferguson as added by Second and Third Lawsuits). (First Lawsuit Complaint, ¶ 19; Second Lawsuit Complaint, ¶ 123; Third Lawsuit Complaint, ¶ 215);

9)     Larry Clements is a member of the purported class. (First Lawsuit Complaint, p. 72; Second Lawsuit Complaint, ¶ 33; Third Lawsuit Complaint, ¶ 72);

10)    Robert Toler is a member of the purported class.  (First Lawsuit Complaint, pp. 74-77; Second Lawsuit Complaint, ¶¶ 35-39; Third

Lawsuit Complaint, ¶¶ 75-82)

The Third Lawsuit also contains factual allegations specifically related to Ms.

Stephens' divorce that are identical to those in the Second Lawsuit:

1)  Belinda Stephens contends that she was divorced in 1998 and that, at
    that time, she lost $100,000 as a result of the alleged conduct of the
    Defendants.  (Compl., ¶¶ 95-97.)

2)  Ms. Stephens alleges she attended a hearing in October 2004 on her
    motion to modify the divorce decree. (Compl., ¶ 99.)  Ms. Stephens
    contends that, at the hearing, there were ex parte conferences between
    Wright (who represented Mr. Stephens) and Judge Calhoun, which then
    allegedly caused her to withdraw her motion for modification causing her
    a loss of more than $75,000. (Compl., ¶¶ 100, 102.)

3)  Ms. Stephens alleges that again in 2006, she filed another motion to
    modify her divorce decree.  Ms. Stephens pleads that her motion for
    modification was assigned to Judge Childers (who she contends was not
    an alleged co-conspirator), but that the Defendant attorneys were
    somehow involved in having the case transferred to another judge and
    that the transfer caused her "loss of property."(Compl., ¶¶ 106-107.)

4)  Ms. Stephens does not allege that any defendant other than Wright had
    any involvement in her divorce.

The only additional allegations found in the complaint in the Third Lawsuit

relate to events that involve Blackburn and his employer, not Plaintiffs.  Blackburn

contends that in 2007, he was originally given approval by Dean Carroll to proceed

with the First Lawsuit, but that approval was withdrawn and Blackburn was restricted

from using any law school resources for prosecution of the First Lawsuit. (Compl., ¶¶ 108-112.) Blackburn further contends that, in spring 2009, he was denied a sabbatical as retaliation for filing the First Lawsuit. (Compl., ¶¶ 114-121.) Blackburn alleges that on or before September 4, 2009, he had conversations with Dean Carroll regarding the filing of the Second Lawsuit and that he was admonished not to use law school resources for the matter, that his publication of a scholarly article in the Alabama Lawyer was blocked, and that false and libelous assertions about Blackburn were manufactured, published, and communicated, thereby violating Plaintiffs' right of access to the courts and freedom of speech on a college campus.  (Compl., ¶¶ 121, 123-126, 130, 187-89, 218-19.) Blackburn further alleges that the filing of the Second Lawsuit resulted in him being threatened with loss of tenure and termination from Samford University. (Compl., ¶¶ 128-131.) Blackburn alleges that the actions of Carroll were caused by complaints of the defendants, Crew, Crittenden, and White. (Compl., ¶ 135.)

Based upon all of these allegations, Plaintiffs assert the following causes of action against all of the defendants in the Third Lawsuit: (1) Claims for violation of RICO based upon five alleged predicate acts: Hobbs Act (Compl., ¶¶ 140-150); Money Laundering (¶¶ 151-153); Mail and Wire Fraud (¶¶ 154-161); and Obstruction

of Justice (¶¶ 184-194);[10] (2) claims for violation of 42 U.S.C. § 1983 (¶¶ 217-220); and (3) state law claims for fraud, suppression and deceit. (¶ 221).

## IV.     Analysis of Joint Motion for Summary Judgment

### A.     All of Plaintiffs' claims are barred by the doctrine of res judicata

Defendants argue that all of Plaintiffs' claims in this lawsuit are barred, and therefore due to be dismissed, based upon the doctrine of res judicata, otherwise known as claim preclusion.  Res judicata will bar not only the claims that were filed in the First and Second Lawsuits but also the claims that *could have been filed* if the following elements are met: "(1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases."  *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir. 1999).

Plaintiffs only contest elements three and four, arguing that Plaintiffs and/or Defendants were not parties to the First and Second Lawsuits and that Plaintiffs' § 1983 claim, and Plaintiffs' RICO claim insofar as it is based on the alleged predicate

---

[10] RICO predicate acts one through four relate to the underlying divorces and the alleged hunting club conspiracy, while the obstruction of justice predicate act relates to adverse employment actions allegedly taken against Blackburn by defendants Carroll, Crew, Crittenden, and White.

act of obstruction of justice, are not barred.[11]

### i.    Identical Parties Element—Second and Third Lawsuits

The element of identical parties is met with regard to the Second and Third Lawsuits.  Plaintiffs Mr. Powell and Ms. Stephens were also the plaintiffs in the Second Lawsuit.  Although none of the current Defendants were still parties in the Second Lawsuit at the time the Court dismissed Judges Calhoun and Ferguson with prejudice,[12] the element of identical parties is still met because Plaintiffs allege multiple times in the Third Lawsuit that all Defendants were co-conspirators of Judges Calhoun and Ferguson.  (Compl., ¶¶ 41, 42, 44, 53, 63, 127, 140, 147, 200, 213, 221.) As alleged co-conspirators, all Defendants in this case are in privity with Judges Calhoun and Ferguson, thus meeting the element of identical parties for res judicata purposes. *See RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP,*

---

[11] As to the first two elements, they are satisfied in any event.  Blackburn alleged in the First and Second Lawsuits that this Court had jurisdiction to decide the claims in those cases.  (First Lawsuit Compl. ¶¶ 1, 3; Second Lawsuit Complaint ¶¶ 1, 2.)  Both cases were dismissed with prejudice, and such dismissals constitute a judgment rendered on the merits. *See Wakefield v. Cordis Corp.*, 304 F. App'x 804 (11th Cir. 2008) (holding that a dismissal on statute of limitations grounds is a decision on the merits).

[12] Defendants Wright and Najjar were named in the Second Lawsuit as defendants who conspired with Judges Calhoun and Ferguson, and they were later voluntarily dismissed without prejudice by Plaintiffs after they had filed a Motion to Dismiss.  The Second Lawsuit was dismissed with prejudice thereafter on the motions of Judges Calhoun and Ferguson.  Crew, Crittenden, Carroll, and White were not named defendants in the Second Lawsuit, but Plaintiffs have claimed in this lawsuit that they were included in the category of unknown co-conspirators with Judges Calhoun and Ferguson.  (Compl. ¶ 7 and n.6.)

800 F. Supp. 2d 182, 193-94 (D.D.C. 2011) ("In this case, the plaintiff's Complaint specifically lists Messrs. Bowen and Model, and Global Petroleum as 'Conspirators Who Are Not Named as Defendants.' See Compl. ¶¶ 5-7. Members of a conspiracy are deemed under the law to be in privity with each other.") (emphasis added); *Gambocz v. Yelencsics*, 468 F.2d 837, 842 (3rd Cir. 1972) ("[W]hat was averred in the original action was a conspiracy participated in by named individuals, and the sole material change in the later suit was the addition of certain defendants, some of whom had been named in the original complaint as participating in the conspiracy but had not been named as parties defendant at that time."); *McLaughlin v. Bradlee,* 599 F. Supp. 839, 846 (D.D.C. 1984). In sum, Plaintiffs are the same from the Second to the Third Lawsuit, and all of the current Defendants were alleged in the Second Lawsuit (either by name: Wright and Najjar, or by inclusion in a category of unknown co-conspirators: Crew, Crittenden, White, and Dean Carroll) to be co-conspirators of Judges Calhoun and Ferguson who obtained a judgment on the merits in their favor and against Plaintiffs.

In arguing that the element of identical parties is not met, Plaintiffs appear to argue that this "privity" concept, for res judicata purposes, was generally "discarded" by the Supreme Court's ruling in *Taylor v. Sturgell*, 553 U.S. 880

(2008). That case established that non-parties are bound by previous judgments if one of six circumstances is established: (1) the non-party agrees to be bound; (2) the non-party has a pre-existing substantive legal relationship with a party to the judgment; (3) the non-party was adequately represented by someone with the same interests who was a party to the prior lawsuit; (4) the non-party assumed control over the litigation in which the judgment was rendered; (5) a party to the judgment is attempting to relitigate the prior judgment through a proxy; or (6) a special statutory scheme expressly forecloses successive litigation by a non-party. *Id*. at 893-96. Plaintiffs argue that Defendants do not fall into one of these discrete categories. Defendants respond that the *Taylor* exceptions only apply in analyzing whether a *plaintiff* is bound by a prior judgment; the exceptions are not applicable to determine whether *defendants* can assert the judgment rendered in the prior lawsuit as a defense to a plaintiff's claims. *See Airframe Sys., Inc. v. Raytheon Co.,* 601 F.3d 9, 17, n.8 (1st Cir. 2010) ("[C]ases like *Taylor v. Sturgell* [] have limited the circumstances under which nonparty *plaintiffs* are precluded from suing the same defendants . . .") (emphasis in original) (internal citation omitted).

Even if the *Taylor* exceptions are applicable to Defendants, the second *Taylor* exception provides that "nonparty preclusion may be justified based on a variety of

pre-existing 'substantive legal relationship[s]' between the person to be bound and a party to the judgment." 553 U.S. at 894. In stating this exception, the *Taylor* Court expressly noted: "The substantive legal relationships justifying preclusion are sometimes collectively referred to as 'privity.'" *Id.* at 894 n.8. The Court did not "discard" use of the term "privity," but instead stated that it was merely avoiding using that term in an attempt to alleviate confusion given certain broad interpretations applied to the term. *Id.* In this case, Defendants are entitled to assert the judgment rendered in the Second Lawsuit as a bar because Plaintiffs allege multiple times in the Third Lawsuit that the Defendants were co-conspirators of Judges Calhoun and Ferguson (the defendants who were dismissed with prejudice in the Second Lawsuit), and the alleged co-conspirator relationship satisfies the "pre-existing substantive legal relationship" discussed in *Taylor*.[13]

---

[13] Indeed, two cases decided post-*Taylor* have held that a "special relationship" or "privity" is sufficient to bar by res judicata a second suit. *See Chavers v. Hall*, 2011 WL 2457943, at *7 (S.D. Tex. June 16, 2011) *aff'd*, 488 F. App'x 874 (5th Cir. 2012) (in a case where the same plaintiffs pursued a second suit on the same nucleus of operative facts against defendants, whom they accused of wrongdoing and conspiracy in the first lawsuit, but whom they chose not to sue in the first lawsuit, the court found that unlike in *Taylor*, there was a "special relationship" tantamount to an identity of parties sufficient to bar by res judicata plaintiffs' second suit against the defendants); *Dodd v. Corporate Does Nos. 1-100*, 2010 WL 2836165, at *2 (M.D. Fla. June 28, 2010), *report and recommendation adopted by* 2010 WL 2836166 (finding newly-added defendants were "properly considered to be in privity with the original defendants, since they have been alleged to be co-conspirators"). Additionally, Plaintiffs' argument that privity does not exist because they have yet to prove that a conspiracy existed between the defendants and Judges Ferguson and Calhoun is meritless, as this case is before the Court on the defendants' motions for summary judgment, and Plaintiffs' allegation of the existence of a conspiracy is taken as true for the purpose of deciding these

### ii.    Identical Parties Element—First and Third Lawsuits

The element of identical parties is also met between the First and Third Lawsuits. Wright and Najjar were defendants in the First Lawsuit. Crew, Crittenden, White and Carroll were not named in the First Lawsuit, but due to Plaintiffs' allegations that all Defendants are in an alleged conspiracy with Judges Calhoun and Ferguson, as discussed in the previous section, they are deemed identical.[14]  Plaintiffs are not the same: Blackburn was the plaintiff in the First Lawsuit; Mr. Powell and Ms. Stephens are Plaintiffs here.  However, as noted, *Taylor v. Sturgell* holds that plaintiffs can be bound by previous judgments under certain circumstances. 553 U.S. at 893-96. Two of these circumstances are implicated here: (3) the non-party was adequately represented by someone with the same interests who was a party to the prior lawsuit; and (5) a party to the judgment is attempting to relitigate the prior judgment through a proxy.  *Id.* at 894-96.

---

motions.  *See Mize*, 93 F.3d at 742.

[14] Additionally, although not totally clear whether in reference to the First or Second Lawsuit, or both, the complaint admits in several places that Dean Carroll, White, Crittenden, and Crew, while not named parties in the RICO suit, were described in a category of unknown defendants and were thus part of the suit.  *See* Compl., p. 4 n.6, ¶ 186.  Additionally, in his response brief in opposition to Dean Carroll's motion to dismiss, Blackburn states "Clearly Crew, White, and Crittenden recognized the roles they played in both the [First Lawsuit] and [the Second Lawsuit]. White, Crew, and Crittenden could have properly intervened in or been joined in both cases if they wished."  (Doc. 50 at 13.)

"In order for the adequate representation prong to apply it must be demonstrated that: (1) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the non-party and (2) the interests of the nonparty and her representative must be aligned." *Baloco v. Drummond Co., Inc.*, 2012 WL 4009432, at *9 (N.D. Ala. Sept. 12, 2012), citing *Taylor*, 553 U.S. at 900. In *Baloco*, the court found that it was "beyond question" that the prior plaintiffs—mothers of the plaintiffs in the action at bar—understood themselves to be suing on behalf of their children based on allegations in the complaints and attachments thereto. *Id.* As to the second element, the court stated that "the inquiry focuses on whether there is a desire for the same outcome and whether the same legal theories in pursuit of that outcome are available." *Id.* at 10. Because the interests of the mothers and their children all arose out of the same common nucleus of operative facts and the same liability issue, the court held that "this is non-party preclusion in its simplest form." *Id.*

Here, Mr. Powell and Ms. Stephens were adequately represented in the First Lawsuit by Blackburn. The complaint in the First Lawsuit makes clear that Blackburn understood himself to be acting in a representative capacity for Powell and Stephens in the that case—he sought to represent a class of all persons involved in domestic

relations cases in Jefferson County before Judge Calhoun, which included Powell and Stephens. (First Lawsuit Complaint, ¶¶ 9, 18.)  As to the second element, Ms. Stephens' and Mr. Powell's interests are aligned with Blackburn's in the First Lawsuit because Blackburn asserted the same alleged "hunting club" conspiracy in the First Lawsuit as has been asserted here.  To be clear, the exact same legal theories have been advanced here as were pursued by Blackburn in the First Lawsuit.  It is irrelevant that Powell and Stephens may have different damage calculations or theories than Blackburn because the parties desired the same outcome—liability of the defendants for the alleged operation of a corrupt tribunal which generally harmed persons who were involved in divorce proceedings before certain domestic relations judges.  *See Baloco*, 2012 WL 4009432, at *10 n.15.  Undeniably, Mr. Powell's and Ms. Stephens' interests in this Lawsuit are the same as Blackburn's were in the First Lawsuit.  *See id.* at *12.

Plaintiffs argue that they do not fall within the "adequate representation" exception to the bar on non-party preclusion because Blackburn was not aware of the named Plaintiffs' individual claims at the time he filed the First Lawsuit. While *Taylor* also stated that "[a]dequate representation *may* also require . . . notice of the original suit to the persons alleged to have been represented," 553 U.S. at 882 (emphasis

added), Plaintiffs have cited no case definitely requiring such notice, and the Court has found none.  And, Plaintiffs' reliance on the finding in *Taylor* that "[n]othing in the record indicates that Herrick understood himself to be suing on Taylor's behalf," *id.* at 905, is distinguishable because the prior lawsuit in *Taylor* was not brought as a class action; the First Lawsuit here was.  Per the pleadings Blackburn filed in the First Lawsuit, he was representing a class of persons which included Plaintiffs in this case.

Plaintiffs also argue that Blackburn was not representing them in the First Lawsuit because Blackburn's attempt to represent a class of divorcees claiming to be injured by their divorce decrees was never granted by the district court.  This argument misses the mark, as the adequate representation exception only requires that Blackburn have understood himself to be acting in a representative capacity and that his interests and the interests of the Plaintiffs be aligned.  *Taylor*, 553 U.S. at 900; *Baloco*, 2012 WL 4009432, at *9.

Even if the "adequate representation" *Taylor* exception does not apply, Plaintiffs nonetheless fall within the fifth *Taylor* exception which states that "a party to a judgment may not avoid its preclusive force by relitigating through a proxy." 553 U.S. at 895. There is certainly evidence to support a conclusion that Plaintiffs are Blackburn's proxies in this lawsuit because they are his undisclosed "litigating

agent[s]." *See id.* As demonstrated at length above, Blackburn has re-filed this same hunting club conspiracy theory and these same claims time and time again on his own behalf until he could no longer do so *without* a proxy or agent. He started these allegations in his own divorce case; he continued them in his malpractice action against his attorney; and he asserted them as RICO claims in both the First and Second Lawsuits.

With regard to the agent or proxy exception, *Taylor* also states that the principles of agency indicate that preclusion is appropriate if "the putative agent's conduct of the suit is subject to the control of the party who is bound by the prior adjudication." 553 U.S. at 906. That is the case here. Blackburn's Third Lawsuit is replete with references to what happened to him as a result of his filing the First Lawsuit—he was denied resources at Cumberland; he was denied a sabbatical; he was threatened in his employment. (Compl., ¶¶ 108-137.) This lawsuit (the fifth time Blackburn has raised hunting club allegations) appears to the Court to be more about Blackburn and the continued vendetta he has against those involved in his divorce or who he believes have somehow harmed him. Indeed, it appears that Plaintiffs' conduct in this suit is clearly subject to Blackburn's control. Blackburn is not only the sole attorney for Plaintiffs, but he also has made decisions regarding the conduct of the

litigation based on his own personal interests, as demonstrated by the allegations concerning Blackburn's reason for dismissal of claims in the Second Lawsuit. (Compl., ¶¶ 6-14.)[15]

Plaintiffs make two responses to Defendants' "litigating through a proxy" argument. First, they argue that Defendants contradict any proxy claim by admitting Blackburn is not a party to this lawsuit in another part of their brief. But the proxy or agent exception does not require that the person bound by a former judgment be a party to the present litigation. Rather, the determining question is whether "the putative agent's conduct of the suit is subject to the control of the party who is bound by the prior adjudication." *Taylor*, 553 U.S. at 906. It is clear that Blackburn controls Plaintiffs and this litigation, as evidenced by the numerous allegations in the complaint pertaining to alleged conduct directed toward Blackburn individually.

Second, Plaintiffs state that "an attorney/client relationship 'cannot furnish the requisite' relationship of the attorney having the legal right and power as principal to control the client as the attorney's agent." (Doc. 49, p. 34). This argument is

---

[15] Blackburn also avers that he dismissed the claims against the attorney defendants in the Second Lawsuit because he felt threatened in his employment with Samford University. (Compl., ¶ 190 ("As the direct and intended result of such Defendants' intimidation and out of abject fear for his family's economic security, Plaintiffs' counsel did attempt to withdraw from representation of Plaintiff clients and to completely dismiss the preceding action against said Defendants.")) There are no allegations about any threat to Ms. Stephens or Mr. Powell.

misguided because, while Blackburn was indeed Plaintiffs' attorney in the Second Lawsuit, it is Blackburn's involvement as the *plaintiff* in the First Lawsuit that gives rise to the agency relationship at issue.

In sum, the parties from the First to the Third Lawsuit are identical because all those currently named as plaintiffs or defendants were either named in the First Lawsuit or they fall into one of the *Taylor* exceptions to the rule of non-preclusion against non-parties.

### iii. Same Causes of Action Among First, Second, and Third Lawsuits

As for the fourth element, whether the same cause of action is involved, the allegations of all three lawsuits arise out of the same nucleus of operative facts and are based on the same factual predicate, meriting a finding that the causes of action between these three lawsuits are the same. *See In re Piper Aircraft Corp.*, 244 F.3d 1289, 1297 (11th Cir. 2001). As stated in Part II.D., *supra*, a comparison of the First, Second, and Third Lawsuits reveals allegations of harm from an alleged "hunting club" conspiracy that purportedly elected judges to favor certain lawyers and litigants. Core common allegations include: Defendants were members of a hunting club that allegedly then was converted to a RICO Enterprise (First Lawsuit Complaint ¶ 11; Second Lawsuit Complaint ¶ 14; Third Lawsuit Complaint ¶ 38); Defendants

conspired to have John Calhoun appointed as a domestic relations judge (First Lawsuit Complaint ¶ 25; Second Lawsuit Complaint ¶ 15; Third Lawsuit Complaint ¶ 41); Defendants formed a RICO Enterprise with five goals: (1) have Calhoun nominated to fill the 1993 judicial vacancy and thereafter to be reelected, (2) increase the Defendants' market share of the domestic relations law practice in the Tenth Judicial Circuit, (3) provide alleged Enterprise profits to Calhoun (and Ferguson per the Second and Third Lawsuits) by way of benefits or kickbacks, (4) devise a scheme to award excessive and inflated attorneys' fees, and (5) employ a scheme to defraud the public while keeping the hunting club a secret (First Lawsuit Complaint ¶¶ 25-29; Second Lawsuit Complaint ¶¶ 97-101; Third Lawsuit Complaint ¶¶ 198-202); a class action should be certified for persons involved in domestic relations cases in Jefferson County before Judge Calhoun (First Lawsuit Complaint ¶ 8; Second Lawsuit Complaint ¶ 123; Third Lawsuit Complaint ¶ 215); there are common representative plaintiffs: Richard Powell and Belinda Stephens (First Lawsuit Complaint ¶¶ 8-10; Second Lawsuit Complaint ¶¶ 29-30; Third Lawsuit Complaint ¶¶ 29-30); there are common class members: Larry Clements and Robert Toler (First Lawsuit Complaint p. 72, 74-77; Second Lawsuit Complaint ¶¶ 33, 35-39; Third Lawsuit Complaint ¶¶ 72, 75-82).

But Plaintiffs contend that res judicata is not applicable to their § 1983 claims or to their "most recent" RICO violations, i.e., those based on the predicate act of obstruction of justice, because these claims only occurred and matured after the filing of the First and Second Lawsuits.  Admittedly, the complaint in this lawsuit also recites allegations that Blackburn was pressured by Dean Carroll to dismiss the Second Lawsuit as a result of complaints by some of the other defendants.  These facts make up part of Plaintiffs' § 1983 claims and comprise the predicate act of obstruction of justice for purposes of Plaintiffs' RICO claim. More specifically, Plaintiffs allege that Dean Carroll violated their constitutional rights to free speech and access to courts when he refused to allow Blackburn to use law school resources for the Second Lawsuit, denied Blackburn a University sabbatical, told Blackburn's law school secretary that she would be fired if she typed private lawsuit-related materials for him, and blocked Blackburn's publication of a scholarly article in the Alabama Lawyer. Plaintiffs also claim that Carroll, White, Crittenden, Crew, unknown Samford administrators, and other known and unknown conspirators, aiders and abettors manufactured, published, and communicated false and libelous assertions about Blackburn, by complaining to Dean Carroll about the filing of the Second Lawsuit.

However, Plaintiffs forget that res judicata bars all claims which were made in

the prior lawsuits or which *could have been made*. *Ragsdale,* 193 F.3d at 1238. The operative question is whether all three lawsuits arise from the same nucleus of operative facts and thus represent the same cause of action for the purposes of res judicata. Here, all three complaints surround the same set of facts—Plaintiffs' claims of a corrupt tribunal which (they contend) issued invalid divorce decrees. Indeed, Plaintiffs do not dispute that the hunting club conspiracy allegations are the same in all three lawsuits; instead, they complain that the new facts pled in the Third Lawsuit relating to Blackburn's interaction with his employer over the filing of the Second Lawsuit are not subject to the application of res judicata.  However, Plaintiffs raised these "new" facts in the Second Lawsuit when they asked the Court for a hearing on the actions they contended were taken to cause the Second Lawsuit to be dismissed.  Because these factual allegations were raised in the Second Lawsuit, all such claims are barred by res judicata. *See Sophocleus v. Ala*. *Dept. of Trans.*, 371 F. App'x 996, 999 n.3 (11th Cir. 2010) ("But Plaintiffs did supplement their pleadings; they set out their allegation of non-public use of their property . . . Plaintiffs' non-public use claims actually were raised as the case unfolded."). Plaintiffs had the opportunity to litigate these issues in the Second Lawsuit, and Plaintiffs' election not to pursue these facts beyond seeking a hearing, such as by amending their complaint to specifically state §

1983 or additional RICO predicate acts, does not alter the result. *In re Onebo*, 2012 WL 3667973, at *3 (Bankr. N.D. Ga. Aug. 17, 2012) ("Plaintiff elected not to asset these claims that arise from the same facts that were before the District Court; the final judgment entered against her in that court bars her from asserting those claims in this Court.") In any event, the "obstruction of justice" allegations don't change the essential nature of these cases making up the same nucleus of operative facts—Plaintiffs are complaining that they were injured in the course of their divorce decrees in state court by the identical alleged RICO enterprise.[16]

In sum, the doctrine of res judicata bars the relitigation of all claims that were or could have been raised in the First and Second Lawsuits. As such, all of Plaintiffs' claims in this lawsuit are due to be dismissed.[17] It is this Court's opinion that the doctrine of res judicata is sufficient to dispose of all of Plaintiffs' claims, but in an

---

[16] Indeed, the "obstruction of justice" facts do not create a new RICO cause of action because a new RICO cause of action does not accrue with respect to subsequent injuries unless the injuries are "new and independent" of Plaintiffs' original injuries. *See Frantz v. Walled*, 2013 WL 1104148, at *4 (11th Cir. March 18, 2013). Plaintiffs' alleged injuries from Blackburn's interaction with his employer in 2009 are related to the originally pled injuries of damage by virtue of the entry or modification of their divorce decrees.

[17] Plaintiffs also argue that because the dismissal of the Second Lawsuit was based upon judicial immunity grounds, the defendants cannot assert res judicata of all claims that were or could have been asserted therein. Plaintiffs asserted the same "hunting club" conspiracy against the judges. Plaintiffs had the opportunity to name all Defendants in this case to that case. Plaintiffs did not do so; thus the purpose of res judicata to protect litigants against multiple lawsuits is hereby served in this case. *See Ragsdale*, 193 F.3d at 1238.

abundance of caution, the Court's analysis will go beyond the aforementioned analysis and provide alternative reasons for why Plaintiffs' RICO, § 1983, and fraud and suppression claims, as well as their class action allegations, are due to be dismissed.

**B.   Collateral estoppel results in the dismissal of all RICO claims, as well as the request for certification of a class action**

Defendants argue that even if the RICO claims were not barred by res judicata, the doctrine of collateral estoppel, or issue preclusion, bars the relitigation of Judge Edenfield's decision in the First Lawsuit that the RICO claims lacked proximate cause, standing, and continuity, and that the "hunting club" conspiracy claims are not suitable for class action treatment.

In order to invoke collateral estoppel, "1) the issue must be identical in the pending case to that decided in the prior proceeding; 2) the issue must necessarily have been decided in the prior proceeding; 3) the party to be estopped must have been a party or have been adequately represented by a party in the first proceeding; and 4) the precluded issue must actually have been litigated in the first proceeding. *Blohm v. Comm'r of Internal Revenue*, 994 F.2d 1542, 1553 (11th Cir. 1993).

As an initial matter, Plaintiffs do not oppose collateral estoppel as a ground for dismissal in their response to the joint motion to dismiss.  The Eleventh Circuit has made clear that failure by a plaintiff to respond to a motion to dismiss argument

constitutes an abandonment of that claim. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."). As such, Plaintiffs' RICO claim is due to be dismissed because Plaintiffs have conceded that it lacks proximate cause, standing, and continuity.

In any event, all of the elements of collateral estoppel are satisfied here. As noted above, Plaintiffs are in privity with Blackburn and were adequately represented in the First Lawsuit. Several identical issues actually litigated and necessarily decided in the First Lawsuit are now binding on the Plaintiffs here, including, proximate RICO causation, standing and continuity.

A plaintiff alleging a civil RICO violation must prove (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity that (5) results in an injury to business or property, and (6) that such injury occurred "by reason of" the substantive RICO violation. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282-83 (11th Cir. 2006). This "by reason of" requirement includes the overlapping concepts of (1) a sufficiently direct injury to confer standing and (2) proximate cause. *Id*. at 1287. In order to have standing to pursue a RICO claim, a plaintiff must show that he

has been directly injured by the alleged enterprise's wrongdoing. *Id.* at 1286. It is not

enough to show an act of racketeering occurred and a plaintiff lost money. Rather,

that plaintiff must show the requisite causal connection between his injury and the

alleged predicate acts. The Eleventh Circuit has provided guidance to this Court by

holding that "courts should scrutinize proximate causation at the pleading stage and

carefully evaluate whether the injury pled was proximately caused by the claimed

RICO violations." *Id.* at 1287.

As to proximate RICO causation, Judge Edenfield found that Blackburn had

failed to plead how the defendants had harmed him:

> [I]t is not enough to simply allege that Wright—he was his wife's
> attorney, so in no way can it be said that he and his firm owed Blackburn
> any sort of duty—was part of a scheme to defraud, violate the RICO
> statute, etc., without also specifying how (e.g. what did he mail, and what
> did he say over the phone or internet or fax lines, that was fraudulent
> and/or somehow furthered a particular RICO enterprise) he allegedly
> defraud Blackburn himself.

2008 WL 850191, at *20. Thus, Judge Edenfield found that there was a lack of direct

causal connection from the actions of the defendants to injuries of the plaintiff. *Id.* at

*24, 26. The identical issue exists here—Wright and Najjar are alleged to be on the

other side of Ms. Stephens' divorce and Crittenden is alleged to be on the other side

of Mr. Powell's divorce. (Compl., ¶¶ 28-30.) There is no proximate cause tying these

Defendants to any of the Plaintiffs' alleged damages.  Plaintiffs do not plead how

Wright and Najjar or Crittenden (the opposing lawyers) somehow harmed them, and

they certainly make no effort to do so with regard to Crew, White or

Carroll—Defendants who were not even involved in their divorces.

Similarly, with regard to Article III standing requirements, Judge Edenfield held

that courts apply both a general standard for standing (an allegation of an injury fairly

traceable to a defendant's actions) plus a RICO-specific standard (plead that an injury

suffered was proximately caused by the underlying RICO predicate acts).  2008 WL

850191, at *6.  Judge Edenfield found that Blackburn's cosmic allegations of attorneys

allegedly contributing to a corrupt tribunal in general and use of generic terms for all

defendants was not sufficient to show Blackburn's standing to pursue claims against

the defendants.  *Id.* at *20, 22.  Those findings are binding on Mr. Powell and Ms.

Stephens.

Judge Edenfield also held that the RICO claims failed to provide the required

continuity. He found that requiring continuity insures that civil RICO actions are

limited to long term criminal conduct, which was Congress' purpose.  *Id.* at *8 n.7.

In order to determine if a threat of continuing criminal activity is posed, a court looks

to the totality of circumstances surrounding the commission of the alleged predicate

acts. *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 516 (S.D.N.Y. 2007).  Judge Edenfield undertook that analysis in the First Lawsuit and found dismissal of the defendant attorneys proper where the underlying divorce cases were over and the judge involved in the underlying divorces was no longer on the bench.  2008 WL 850191, at *22.   The same situation exists with respect to the Plaintiffs here.  Mr. Powell's and Ms. Stephens' divorces are over and the judges who handled those cases, Judges Calhoun and Ferguson, are no longer on the bench in Jefferson County, Alabama. (Compl., ¶ 53-54.)  Plaintiffs concede that both Calhoun and Ferguson are "Former Circuit Court Judges".  (Compl., p. 17, ¶ 53.)  There is thus no threat of continuity present in the Plaintiffs' allegations concerning the outcome of the underlying divorce proceedings as those cases are over.   Judge Edenfield's findings as to continuity are also binding on Powell and Stephens.

Finally, Judge Edenfield held that the claims in the First Lawsuit were not suitable for class action treatment because the claims of the class were not common: "[T]he pleaded particulars of their cases demonstrate that substantively dissimilar legal points figure into their individual claims . . ." 2008 WL 850191, at *21.

Judge Edenfield's order dismissing the First Lawsuit because the RICO claims did not sufficiently plead proximate cause, standing, or continuity and because the

class claims lacked commonality was appealed to the Eleventh Circuit and affirmed. The Plaintiffs, having been adequately represented in the First Lawsuit, are now bound by the Court's decision on these issues. Accordingly, if Plaintiffs' RICO claims and class action allegations were not barred by res judicata, they are barred by the doctrine of collateral estoppel.

### C.   Ms. Stephens' RICO claim is also barred by the applicable statute of limitations

If it was not barred by res judicata, Ms. Stephens' RICO claim would be barred by the statute of limitations for civil RICO claims, which is four years. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). The statute of limitations begins to run on the date that a plaintiff has knowledge of his injury. *Rotella v. Wood*, 528 U.S. 549, 554 (2000) (rejecting the injury and pattern discovery rule previously adopted by several circuits, including the Eleventh Circuit).

The complaint in the Third Lawsuit clearly pleads that Ms. Stephens was aware of her injury (the divorce decree) more than four years ago. Ms. Stephens contends that she was first injured in 1998 when she "lost over $100,000 as a result of [numerous parties' alleged] predicate acts." (Compl., ¶ 97.) She also complains of a subsequent 2004 hearing to modify her divorce decree wherein she "arrived at court to discover Calhoun as judge engaged in an ex parte conference with Wright, Wright's

client Mr. Stephens, and Mr. Stephens' new wife." (Compl., ¶ 100.) (emphasis added).  Ms. Stephens avers that her lawyer was "directly threatened by Calhoun" which caused her to withdraw her motion for modification.  (Compl., ¶ 101.)  Ms. Stephens contends that each of her children lost more than $75,000 in support and further, that she was put into debt and lost her home to foreclosure. (Compl., ¶¶ 102-103.)  Although Plaintiffs' complaint vaguely mentions the filing of a second motion to modify in 2006, she only alleges that the Defendants were somehow involved in getting the motion to modify transferred from Judge Childers (not in the alleged conspiracy) to an unnamed judge which she contends caused her damage. (Compl., ¶¶ 106-107.)

Ms. Stephens filed this lawsuit in 2013, more than fifteen years after entry of her 1998 divorce decree [and alleged loss of over $100,000], more than eight years after the hearing on her first motion to modify her divorce decree, and more than six years after filing her second motion for modification. (Compl., ¶¶ 97-107.)  Each of these events represent injuries, and Ms. Stephens was clearly aware of them as, by her own admission, she "arrived at court [in 2004] to discover" the alleged ex parte conference involving Wright and was a witness to her lawyer being directly threatened by Judge Calhoun. (Compl., ¶¶ 100, 102.)  It was at that time Ms. Stephens withdrew

her motion for modification which she contends caused her to suffer a loss.  Based upon her own allegations, Stephens' RICO claims asserting knowledge of injuries in 1998 and 2004 are, therefore, time-barred and due to be dismissed.

Plaintiffs' assertion is that the four year statute of limitations for RICO claims does not begin to run until after a period of reasonable diligence for plaintiffs to ascertain sufficient facts to file a complaint. (Compl., ¶ 21-22; Brief in support of Complaint, pp. 61-62.) Plaintiffs contend they reached this conclusion by reading two Eleventh Circuit decisions: *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275 (11th Cir. 2005) ("*Tello I*") and *Tello v. Dean Witter Reynolds, Inc.*, 494 F. 3d 956 (11th Cir. 2007) ("*Tello II*").

However, Plaintiffs' analogy to *Tello I and Tello II* misses the mark.  *Tello I* and *Tello II* were cases addressing the application of the statutory limitations period found in the Sarbanes-Oxley Act ("SOA"), 28 U.S.C. § 1658(b).  The statutory limitations period in the SOA does not hinge on notice of injury, but, instead on notice of a violation of the SOA. *Tello I*, 410 F. 3d at 1279 ("a private right of action [under the SOA] … may be brought not later than the earlier of (1) 2 years after the discovery of the facts constituting *the violation*; or (2) 5 years after such violation.") (emphasis added).  Thus, the statutory limitations found in the SOA and the statute of

limitations applicable to RICO claims are not the same and *Tello I* and *Tello II* are inapplicable.  *See also Lehman v. Lucom*, 2012 WL 1802435, at *7 (S.D. Fla. May 17, 2012) ("In a final effort to avoid the application of the statute of limitations to their RICO claims, the Plaintiffs argue that their RICO claim should not be considered to have accrued until after they had discovered a pattern of racketeering activity . . . This argument fails [because] the Supreme Court has expressly rejected the injury and pattern discovery rule.") (citing *Rotella*, 528 U.S. at 558).

### D.    Plaintiffs' 42 U.S.C. § 1983 claims are barred by the applicable statute of limitations

Even if they were not barred by res judicata, Plaintiffs' § 1983 claims would be barred by the applicable statute of limitations.  Plaintiffs allege that Dean Carroll violated their constitutional rights to free speech and access to courts when he refused to allow Blackburn to use law school resources for the Second Lawsuit, denied Blackburn a University sabbatical, told Blackburn's law school secretary that she would be fired if she typed private lawsuit-related materials for him, and blocked Blackburn's publication of a scholarly article in the Alabama Lawyer.[18]  They also

---

[18] The "deprivation of the freedom of speech" claim and the access to courts claim are based on the same factual allegations because Plaintiffs allege that "they have been deprived by Defendants and their coconspirators of these federal rights of speech and expression in federal court by reason of Defendants' bringing their obstructive fraud on to Samford's campus."  (Doc. 49, p. 53.)

claim that Carroll, White, Crittenden, Crew, unknown Samford administrators, and other known and unknown conspirators, aiders, and abettors manufactured, published, and communicated false and libelous assertions about Blackburn.   All of these events are alleged to have occurred in 2009 and 2010.  (Compl. ¶¶ 130, 187-89, 218-19.)

Section 1983 does not contain a statute of limitations. *Bd. of Regents of Univ. of N.Y. v. Tomanio*, 446 U.S. 478, 483 (1980).  Instead, "constitutional claims brought under § 1983 are tort actions subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought." *Crowe v. Donald*, 528 F.3d 1290, 1292 (11th Cir. 2008) (quotation omitted).  In Alabama, that limitations period is two years. *See Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1483 (11th Cir.1989); *Hutcherson v. Riley*, 2006 WL 2989214, *5 n. 7 (S.D. Ala. Oct. 18, 2006) ("The statute of limitations period for § 1983 claims is determined by reference to the applicable state law period for personal injury torts, which in Alabama is two years.").

When a § 1983 claim accrues is a question of federal, not state, law. *See Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987).  It is well established in § 1983 cases that the statute of limitations begins to run when "the facts which would

support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Id.* Thus, the limitations period for a § 1983 claim starts when : (1) "the plaintiff knows or has reason to know that he has been injured," and (2) "the plaintiff is aware or should have been aware who has inflicted the injury." *Id.*

Plaintiffs argue that their § 1983 claims are not barred by the two-year statute of limitations because events in 2012 somehow prevented Plaintiffs from raising their § 1983 claims until now.  More specifically, Plaintiffs allege that in June 2012, Dean Carroll provided Blackburn with a copy of an internal investigative report, from which Blackburn learned of Dean Carroll's motivations for making the alleged threats to Blackburn in 2009.  Plaintiffs claim that the "fraud" contained in the 2012 report concealed their constitutional claim.[19]

Contrary to Plaintiffs' assertion, the face of the pleadings in this case clearly

---

[19] According to Plaintiffs, after Blackburn learned that Crew, Crittenden, and White had complained to Dean Carroll in May 2010, Blackburn initiated internal grievance procedures at Samford University, and in April 2012, the university undertook to study such matters. (Amended Comp., ¶¶ 6-15, 134).  A final report of the study was provided to Blackburn in June 2012.  The report apparently cited portions of Judge Edenfield's opinion in the First Lawsuit as a basis for Dean Carroll's actions in his September 2009 letter to Blackburn.  In other words, Judge Edenfield's decision was used to justify Dean Carroll's denial of school resources to Blackburn with regard to his pursuing the Second Lawsuit.

demonstrate that the facts which support the § 1983 access to the courts and freedom of speech claims were apparent to Plaintiffs years before the internal report's disclosure.  Plaintiffs allege that within a week after filing the Second Lawsuit, Blackburn was contacted by Dean Carroll and informed of complaints from members of the bar about the lawsuit. (Compl., ¶ 124.)  Blackburn was told at the time not to use University resources for the suit.  (Compl., ¶ 125.)  Then, on September 4, 2009, Dean Carroll sent a letter to Blackburn allegedly threatening Blackburn with loss of tenure and termination for continuation of the Second Lawsuit. (Compl., ¶ 130.)  Shortly thereafter, on September 7, 2009, Blackburn moved to withdraw as counsel in the Second Lawsuit.  (Compl., ¶ 132).  Subsequently, on September 13, 2009, Blackburn reappeared as counsel for Plaintiffs in the Second Lawsuit and filed a Notice of Dismissal of all claims against the attorney defendants.  (Compl., ¶¶ 132-33.)  Thus, as of September 2009, Plaintiffs were aware of their alleged injuries of denial of access to courts.

With regard to Plaintiffs' awareness of *who* was the cause of their injury, Plaintiffs' amendment to the complaint demonstrates without doubt that by May 2010, they were aware of the identity of the persons who were alleged to have complained to Dean Carroll.  (Am. Compl., ¶ 1, Compl. ¶ 134-36.) Indeed, Plaintiffs

raised these same allegations in the Second Lawsuit on May 14, 2010, by filing a "Request for Hearing on Current and Dismissed Defendants' Obstruction of Administration of Justice, Obstruction of Justice." In that motion, Plaintiffs alleged that Defendants and co-conspirators "intentionally engaged in threatening letters and communications which did influence, obstruct and/or impede the due administration of justice." These co-conspirators were specifically identified as Dean Carroll, Crittenden, Crew, and White. Plaintiffs further alleged that the co-conspirators forced dismissal of the defendant attorneys from the Second Lawsuit by their complaints to Dean Carroll which instigated him to threaten Blackburn with adverse job actions. Plaintiffs' Rule 59 Motion in the Second Lawsuit, filed in June 2010, makes clear that Plaintiffs had knowledge of the facts supporting their § 1983 claim:

> Defendants' coconspirators engaged in confidential communications with employer of Plaintiffs' counsel. Defendants and coconspirators used their influence to induce employer to threaten adverse job action against Plaintiff's counsel if this case continued. As a result of such threats this action was impeded.
>
> 49. Plaintiffs' counsel under economic duress dismissed all attorney defendants and attempted complete withdrawal from this case.
>
> 50. Defendants' actions were a violation of 19 U.S.C. §1503(a) of obstruction and of §1512 of impeding a witness and were only recently disclosed by Plaintiff Counsel's employer after a period of approximately eight months.

(Second Lawsuit, Doc. #34, at p. 20.) These statements are an admission by Plaintiffs that the actions of Defendants allegedly denying them access to the courts had been recently disclosed to them. By June 2010, it was or should have been quite obvious to the plaintiffs that their § 1983 claims had accrued, as they were completely on notice of every fact currently alleged in support of their claims under § 1983.  The complaint in this action was filed more than two years later, on January 10, 2013. As such, Plaintiffs' § 1983 claims are time-barred.

Plaintiffs' argument that the statute of limitations should be tolled because Dean Carroll and Cumberland School of Law's delay in disclosing an internal investigative report into Blackburn's complaints is unpersuasive.  Regardless of whatever "motivations" were revealed in the internal report provided to Blackburn in June 2012, Plaintiffs allege the threats themselves were made in 2009, and it is undisputed that Plaintiffs had knowledge of the alleged threats in 2009 and 2010.  The alleged revelation of Dean Carroll's motives in 2012 is immaterial to the accrual of Plaintiffs' cause of action in 2010. Plaintiffs have not identified how the delayed disclosure of the investigative report prevented them from earlier filing of the § 1983 access to courts claim, nor have Plaintiffs alleged any injuries hidden from them before the investigative report was disclosed.  "Equitable tolling is a rare remedy to be

applied in unusual circumstances, not a cure-all for an entirely common state of affairs." *Combs v. Nelson*, 419 F. App'x 884, 886 (11th Cir. 2011) (rejecting appellant's argument that "the limitations period should have been tolled because a delayed response to and an inadequate investigation of his internal grievance impeded him from timely filing the complaint against these defendants").  Given that in 2010, Plaintiffs filed two separate motions asserting that the same defendants named herein had impeded their access to the courts, based on the same facts alleged in this case, there is nothing that would justify tolling the § 1983 claim until June 2012. In sum, if Plaintiffs' § 1983 claims against all defendants were not barred by res judicata, they are time-barred and due to be dismissed.[20]

### E.   Plaintiffs' common law fraud, suppression, and deceit claim is barred by the applicable statute of limitations

-----

[20] As noted, Plaintiffs appear to assert a separate § 1983 claim for due process violations arising out of the alleged hunting club conspiracy and attorneys' fees awards in their divorce cases. Plaintiffs allege that, beginning in 1993 (Compl., ¶ 41), known and unknown defendant attorneys, nominating committee attorneys, co-conspirators, and aiders and abettors, conspired with former Judges Calhoun and Ferguson to allow the attorneys to charge or collect contingent legal fees in divorce cases.  (Compl., ¶¶ 41(c)-(d), 43, 218-219.)  As to Mr. Powell, this is last alleged to have occurred on June 8, 2009.  (Compl., ¶ 87.)  As to Ms. Stephens, this is last alleged to have occurred either in October 2004 or in 2006.  (Compl., ¶¶ 99-100, 106.)  Based on the allegations in the complaint, Plaintiffs' § 1983 claims related to the remaining defendants and the hunting club conspiracy accrued between 1993 and 2006.  These same conspiracy allegations were made in the First and Second Lawsuits, Mr. Powell's and Ms. Stephens' claims were addressed in a memorandum opinion issued by Judge Armstrong the Second Lawsuit.  Any attempt to now assert a § 1983 due process claim relating to their divorce cases is well outside the statute of limitations. Without question, they had notice of the facts underlying their § 1983 claims more than two years prior to January 10, 2013, the filing date of their complaint.

Even if it was not barred by res judicata, Plaintiffs' fraud, suppression, and deceit claim would be time-barred.  The Second and Third Lawsuits contain the same one paragraph allegation purporting to allege a claim of fraud, suppression, and deceit. In general terms, the claim is that Defendants owed a duty to Plaintiffs to disclose an alleged relationship with Judges Ferguson and Calhoun and the attorneys involved in Plaintiffs' divorces, as follows:

> Defendants and coconspirators Ferguson, Calhoun, Known and Unknown Defendant Attorneys, and Nominating Committee Lawyers, being under a fiduciary duty to disclose all conflict of interest facts to Plaintiff class members, failed to disclose and actively suppressed material facts pertaining to the disqualification of Calhoun and Ferguson and other material facts as specified herein constituted fraud, fraudulent suppression and deceit.

(Compl., ¶ 221, Second Lawsuit Compl., ¶ 93.)[21]

Fraud claims in Alabama are governed by a two-year statute of limitations.  Ala. Code § 6-2-38(1) (1975).  The two-year period for fraud and misrepresentation claims begins to run when the plaintiff has or should have discovered the fraud. *Kelly v. Conn. Mut. Life Ins. Co.*, 628 So. 2d 454, 458 (Ala. 1993); *see also Auto Owners v. Abston*, 822 So. 2d 1187, 1195 (Ala. 2001) (holding that the statute of limitations for fraud begins

---

[21] The complaint in the Third Lawsuit inserts the phrase "and coconspirators" between the words "Defendants" and "Ferguson", as well as the phrase "conflict of interest" between the words "all" and "facts."

to run when the plaintiff is in possession of facts which would "provoke inquiry in the mind of a [person] with reasonable prudence . . .").

Plaintiffs filed the Second Lawsuit on August 12, 2009.  When Plaintiffs filed the Second Lawsuit, they asserted this near-identical state law fraud claim.  Thus, Plaintiffs pled that they knew and were aware of the alleged fraud at the latest by August 12, 2009, over three years before the Third Lawsuit was filed.

In various response briefs, Plaintiffs concoct a new fraud claim, stating that misrepresentations were made by Crew, Crittenden, and White about Blackburn to Dean Carroll regarding the First Lawsuit and that the misrepresentation was then suppressed from the plaintiffs and their counsel until the release of the internal investigative report in June 2012.  (Doc. 54, pp. 4-6.)[22]  To the extent this can be viewed as a separate cause of action, it is also time-barred because Plaintiffs themselves have alleged that they were in "possession of facts which would provoke

---

[22]   They thus argue that their fraud and suppression claim, like their § 1983 claim, is not barred by the two year statute of limitations because "facts constituting the fraud and concealment were not and could not have been discovered prior to disclosure in the University Report in June-July 2012."  In other words, Plaintiffs attempt to conflate this one-paragraph fraud and suppression claim, which is verbatim the same claim as asserted in the Second Lawsuit, with a new fraud claim regarding alleged misrepresentations revealed in June 2012.  As an initial matter, Plaintiffs' response brief provides no basis to save Plaintiffs' fraud and suppression claim from dismissal.  The fraud and suppression claim asserted in Plaintiffs' complaint is wholly unrelated to the alleged deprivation of Plaintiffs' § 1983 rights and the internal investigative report disclosed in 2012.  The fraud and suppression claim is stated in a single paragraph, as recited above.  It involves no allegation of Defendants' purported obstruction of justice or Dean Carroll's purported failure to identify the complaining attorneys to Blackburn.

inquiry," *Abston*, 822 So. 2d at 1195, more than two years prior to filing of this lawsuit. *See* Compl. , ¶ 134 (alleging that Blackburn did in fact inquire of Dean Carroll in 2009 about the motivations for his actions, and that Dean Carroll identified the complaining lawyers in May 2010). As such, if Plaintiffs' state law fraud claims are not barred by res judicata, they are barred by the applicable two year statute of limitations.

### F.   Plaintiffs fail to state a claim under RICO

As noted, Judge Edenfield has previously dismissed Plaintiffs' RICO claim based on the hunting club conspiracy as a result of a lack of direct causal connection from the actions of the defendants to injuries of the plaintiff. *See* 2008 WL 850191, at *24, 26. Plaintiffs do not oppose collateral estoppel as grounds for dismissal of their RICO claim, and it is thus due to be dismissed.

However, Plaintiffs also predicate their RICO claim on alleged threats, coercion, and obstruction of justice directed against Blackburn by his employer and others. Per the allegations of the complaint, Crew, Crittenden, and White went to Dean Carroll and complained about the filing of the Second Lawsuit. (Compl., p. 34 ¶ 111.) Plaintiffs' complaint avers that these threats, along with the denial of law school resources being devoted to the litigation, denial of a sabbatical to the Ukraine, blockage of an article in the Alabama Lawyer periodical, and the manufacture,

publication, and communication of false and libelous assertions, violated Ms. Stephens and Mr. Powell's access to the courts and inhibited their freedom of speech. (Compl., p. 37, ¶ 130, p. 40, ¶ 121, p. 54, ¶¶ 187-189, and p. 71, ¶¶ 218-219.)  Plaintiffs also contend that unknown Samford administrators communicated false assertions about Blackburn to the U.S. Attorney's office, which was at that time reviewing Blackburn's obstruction of justice claims for possible criminal investigation, and thus obstructed the U.S. Attorney's review, preventing a "possible criminal investigation." (Compl., ¶ 15.)

The RICO claim predicated on an alleged obstruction of justice, to the extent it is not barred by res judicata, fails for the same reasons that Judge Edenfield discussed in the First Lawsuit, including lack of proximate cause and standing.  The Eleventh Circuit has made it clear that an analysis of proximate causation includes an inquiry into whether the alleged conduct was aimed primarily at a third person rather than the plaintiff. *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1307 (11th Cir. 2003).  By the very words of the Plaintiffs' complaint, all of the alleged obstruction of justice conduct would have been directed at Blackburn rather than Mr. Powell or Ms. Stephens.  Even were the Defendants alleged to have acted as against Blackburn with an intent to damage Plaintiffs, such a claim fails to provide a sufficient

causal connection.  The mere allegation of a specific intent to harm does not overcome or satisfy the requirement that there be a direct injury.  *Id.* (citing *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 242 (2d Cir. 1999).  Further, the Supreme Court noted in *Holmes v. Securities Investor Protection Corp.*, that the less direct an injury is, difficulties of ascertaining and attributing damages become prohibitive.  503 U.S. 258, 268-69 (1992).  Giving full credence to the claims contained within the Plaintiffs' complaint, Plaintiffs suffered no damage.  Blackburn made decisions concerning the previous lawsuits based on his own interests.  Further, the allegations of conspiracy and obstruction of justice concern only alleged actions against Blackburn.  Any effect on the Plaintiffs from the alleged obstruction of justice would have been, at best, contingent on harm done to Blackburn.  A causal connection solely contingent on harm suffered by third parties is too remote to supply a direct injury for purposes of RICO.  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006); *Holmes*, 503 U.S. at 268.  In this case, Plaintiffs make no claim of any predicate act directed at them or that had a direct effect upon them.  Instead, they claim only that they were indirectly and adversely affected by decisions made by their lawyer, who claims that it was he who was the subject of the alleged conspiracy.  However, because he is not the plaintiff in the action, and as he has expressly disclaimed

membership in the class of plaintiffs, actions taken against him cannot meet the proximate cause requirements of a predicate act under RICO. As such, Plaintiffs' claims are not actionable and must be dismissed.

Plaintiffs' obstruction of justice allegations also do not suffice to give these Plaintiffs standing to pursue their RICO claims. The complaint details denial of law school resources to Blackburn, denial of a sabbatical to Blackburn, blockage of publication of a article by Blackburn, and threats to Blackburn's employment. (Compl., ¶¶ 108-137). Each of these allegations concerns Blackburn, rather than the Plaintiffs. Therefore, Plaintiffs have no standing to pursue these claims. A plaintiff who complains of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts lacks standing to pursue a RICO claim. *Holmes*, 503 U.S. at 268-69; *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 906 (11th Cir. 1998). Plaintiffs make no allegation whatsoever tying alleged threats against their counsel to a lack of access to the court system. In various response briefs, Plaintiffs state that they could not retain other counsel because their representation in this highly disfavored case against Alabama lawyers would be and was declined by other attorneys. However, choice of particular counsel is not a right afforded to a civil plaintiff. *Bridgewater Prods., Inc. v. HSBC Mortgage Corp.*, 2008 WL

2813283, *2 (S.D. Fla. Jul. 18, 2008) (citing *Poole v. Lambert*, 819 F.2d 1025, 1028 (11th Cir. 1987)).  In fact, there is no constitutional right to counsel in a civil case. *Gandy v. Reid*, 505 F. App'x 908, 911 (11th Cir. 2013).  Plaintiffs were free to pursue their claims in the Second Lawsuit and any alleged threats or coercion to Plaintiffs' counsel did not inhibit their access to the courts, or constitute an obstruction of justice.  As with the proximate cause issue above, Plaintiffs simply cannot establish standing based upon an alleged conspiracy against their current lawyer.  As such, their claims are due to be dismissed.[23]

## V.    Conclusion

For the foregoing reasons, Defendants' Joint Motion to Dismiss on Common Grounds, converted into a motion for summary judgment, is due to be granted as to all of Plaintiffs' claims.   As noted, each defendant filed his or her own motion to dismiss, to which Plaintiffs responded, and each defendant replied.  In these individual

---

[23] Finally, and alternatively, the alleged obstruction of justice predicate act, insofar as it is based on unknown Samford administrators preventing the U.S. Attorney's Office's "possible criminal investigation," Compl., ¶ 15, fails to state a claim for obstruction of justice because it does not allege a pending, contemplated, or actually foreseen criminal proceeding. *See Arthur Andersen, LLP v. United States*, 544 U.S. 696, 707 (2005) (to obstruct justice, there must be a pending proceeding, a proceeding about to be instituted at the time of the obstructing offense, or contemplation of an official proceeding).  Two Supreme Court cases have held that a federal agency's review of a claim for *possible investigation* is not a "specific," "contemplated," or "foreseen" judicial proceeding, and as such is not an adequate foundation for an obstruction of justice charge. *See Arthur Andersen,* 544 U.S. at 707 and *United States v. Aguilar*, 515 U.S. 593, 598 (1995).

motions, Defendants provide a myriad of alternative reasons for why all of Plaintiffs'
claims fail.  The Court has considered the arguments set forth therein, but determines
that it would be a waste of judicial resources to analyze each alternative argument,
when the arguments set forth in the joint motion sufficiently dispose of all of the
plaintiffs' claims.[24]  As such, the individual motions to dismiss are will be denied as
moot.

Finally, the Wright and Najjar defendants have also filed a motion requesting
that this Court impose sanctions on Plaintiffs and their counsel (doc. 59), to which
Plaintiffs have responded (doc. 63).  The Court also acknowledges that the White
defendants have indicated their desire to file a motion pursuant to Rule 11 to sanction
Plaintiffs and their counsel and award White their attorneys' fees and costs.  (*See* Doc.
35 at 32.)  Should the Wright and Najjar defendants and/or Plaintiffs wish to file any
supplement to Wright and Najjar's motion for sanctions and response thereto, they
must do so within ten (10) days of the date of entry of this Order, not to exceed fifteen
(15) pages in length.  Should any other defendants consider a motion for sanctions to
be appropriate in this case, they must likewise file any such motion within ten (10)

---

[24] The Court has parsed through the complaint and is convinced that there are no allegations
directed at any one defendant individually that have not already been addressed and disposed of in
this opinion.

days of the date of this Order, not to exceed fifteen (15) pages in length.  Plaintiffs will then have ten (10) days thereafter in which to respond, such response also not to exceed fifteen (15) pages.

A separate Order will be entered consistent with this opinion.

Done this 14th day of June 2013.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
[160704]